UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
──────────────────────────────────────x

QUINTESSA HUEY, Individually and on
Behalf of All Other Similarly Situated,

                Plaintiff,

  -against-                                          24-cv-01910 (CM)

ANAVEX LIFE SCIENCES CORPORATION
and CHRISTOPHER U. MISSLING,

                Defendants.
──────────────────────────────────────x

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

McMahon, J.:

      This is a securities fraud class action. Plaintiff's Amended Complaint (the "Amended Complaint" or "Am. Compl.") asserts a single claim under Section 10(b) of the Securities Exchange Act of 1934 against Anavex Life Science Corporation ("Anavex") and Christopher Missling, who is Anavex's Board Chair, CEO, President, and Secretary (collectively, the "Defendants"). The Amended Complaint also asserts a related "controlling person" claim under Section 20 of the 1934 Act against Missling.

      Defendants have brought a Motion to Dismiss Plaintiff's claims. Dkt. No. 36. For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED.

## DISCUSSION

### I. Legal Standard

The following are the rules of law the court will use to evaluate Defendants' arguments as to why Plaintiff has failed to plead a viable claim under Exchange Act Section 10(b) and Rule 10(b)-5.

**Falsity:** To state a claim under Section 10(b) of the Exchange Act, which is subject to the enhanced pleading requirements of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), the plaintiff must not only identify the statements that are alleged to be fraudulent but also "explain why the statements were fraudulent." *Rombach v. Chang*, 355 F. 3d 164, 172 (2d Cir. 2004).

The mere fact that an adverse event occurred following the making of a statement to the market is an insufficient basis from which to infer that the statement was false when made. "Hindsight pleading" – too frequently seen in securities fraud cases – is impermissible, as "without contemporaneous falsity there can be no fraud." *In re Lululemon Sec. Litigation*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015). "An earlier statement is not somehow made misleading simply because it failed to foretell a defect [or] problem which later materialized." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009). A plaintiff must, therefore, allege facts "from which the Court can reasonably infer that the statements were false at the time they were made." *Gross v. AT&T Inc.,* 2021 WL 9803956, at *3 (S.D.N.Y. Sept. 27, 2021), *aff'd sub nom. Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022).

However, if facts are pleaded tending to indicate that a speaker "did not hold the belief she professed," the statement is actionable, because a statement that is not believed when made is a

false statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186 (2015).

**Materiality/Reasonable Reliance**: Certain types of statements are categorically incapable of being "false" or "misleading" because by their very nature no reasonable investor would rely on them. These include "forward-looking" statements, "puffery" and statements of opinion.

Statements fairly characterized as "forward looking," or predictive, are immaterial as a matter of law as long as they are accompanied by risk disclosure language that "sufficiently warns" an investor that these are not statements of existing fact and are subject to factors "that could cause actual results to differ materially." 15 U.S.C. § 78U-5(c)(1)(A)(i). Such forward-looking statements are frequently couched in terms of belief or expectation; use of the phrases "we expect" or "we believe" is generally taken as an indication that a statement is forward looking – especially when the statement of expectation or belief is coupled with language explaining why things might not work out. *See Medina v. Tremor Video, Inc.,* 2015 WL 1000011, at *3 (S.D.N.Y. March 5, 2015), *aff'd*, 640 F. App'x 45 (2d Cir. 2016). Statements of this nature are referred to as being protected by the so-called "bespeaks caution" doctrine (for statements made in a Registration Statement governed by the Securities Act of 1933, 15 U.S.C §§ 77a et seq.) or by the "safe harbor" provisions of the PSLRA, 15 U.S.C. § 78u-5(c)(1)(A)(i), which applies to claims asserted under the Securities Exchange Act of 1934, 15 U.S.C §§ 78a et seq. In either event, they are not actionable. *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 230 (S.D.N.Y. 2023).

The same rule and the same protections apply to statements that qualify as "puffery," or corporate optimism – statements that are not "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys., v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). Again, the use of

3

phrases like "we expect" or "we believe" are signs of puffery, since "such language, at a minimum, signals to prospective investors that the predictions of the Company may not come to fruition." *Ladmen Partners, Inc., v. Globalstar, Inc.,* 2008 WL 4449280, at *13 (S.D.N.Y. Sept. 30, 2008). Statements expressing a general view that "things are going well," that a company is "well positioned," or that a year was "successful" are also generally deemed to be puffery, and hence non-actionable. *City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.,* 2019 WL 452051, at *4 (S.D.N.Y. Feb. 5, 2019).

As a general rule, statements of opinion, rather than actual fact, are not actionable. *See Omnicare*, 575 U.S. at 186. This is because opinions are "not quantifiable" and "are subject to interpretation." *Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 174 (E.D.N.Y. Mar. 16, 2017), *aff'd*, 731 F. App'x 35 (2d Cir. 2018). However, as the Supreme Court cautioned in *Omnicare*, an opinion can be the basis for a securities fraud claim if an "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

**Scienter:** In order to state a viable claim under the Exchange Act, a plaintiff must allege facts from which a trier of fact could infer that the misstatement was made with scienter – that is, with knowledge of the statement's incorrectness and/or a motive to lie or misstate. It is well settled that the pleaded facts, if circumstantial (as they often are), must give rise to a "strong inference" of conscious misbehavior or recklessness. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007). "Under [the] heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).

4

Specific factual allegations about events such as "suspiciously timed" stock sales by corporate executives, *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 139 (S.D.N.Y. June 8, 1999), or dramatic errors in public announcements, *see Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), are generally thought of as giving rise to a strong inference of scienter by speakers, because they are indicative of a motive to lie or shade the truth. However, any circumstances that strongly evidence conscious misbehavior or recklessness can give rise to a viable allegation of scienter when "viewed holistically and together with the allegations of motive and opportunity." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 177 (2d Cir. 2023).

**Loss Causation:** "The loss causation pleading standard is 'not meant to impose a great burden upon a plaintiff.'" *In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). To allege loss causation under Section 10(b) and Rule 10b–5, a plaintiff "must provide in the complaint 'notice of what the relevant economic loss might be and what the causal connection might be between that loss and the misrepresentation.'" *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 559 (S.D.N.Y. 2021) (quoting *Dura*, 544 U.S. at 347). "A plaintiff can plead loss causation only by alleging that the defendant's misstatements or omissions 'concealed something from the market that, when disclosed, negatively affected the value of the security,'" *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 282 (S.D.N.Y. 2008) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)), and the plaintiff must allege that the subject of the fraudulent statement or omission was the actual cause of the loss suffered, *Lentell*, 396 F.3d at 173 (citing *Suez Equity Investors, L.P. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001)).

5

"Because corporate wrongdoers rarely admit that they committed fraud, 'it cannot ordinarily be said that a drop in the value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.'" *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010) (quoting *Lentell*, 396 F.3d at 173). "Thus, the 'relevant truth' required under *Dura* is not that a fraud was committed per se, but that the 'truth' about the company's underlying condition, when revealed, causes the 'economic loss.'" *Id*.

"Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of the risk concealed." *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020). But "corrective disclosure" and "materialization of risk" are not "fundamentally different pathways for proving loss causation," *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016); "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus," *id*. at 262.

## II. All Claims Asserted Under Section 10(b) of the Securities Exchange Act of 1934 Are Dismissed With Prejudice and Without Leave to Amend

### a. Falsity

Let's begin with a little factual background.

Defendant Anavex is a biopharmaceutical company researching treatments for central nervous system diseases. Between 2017 and 2024 it was developing a drug called ANAVEX 2-73 for the treatment of Rett Syndrome, a relatively rare neurological disorder affecting brain

6

development. During these years, it conducted two relevant clinical trials of the drug: the first study, called AVATAR, was a Phase 2 clinical trial to evaluate the safety and efficacy of ANAVEX 2-73 in approximately 33 patients with Rett Syndrome over a 7-week treatment period; the second study, called EXCELLENCE, was a Phase 2/3 trial to evaluate the safety and efficacy of ANAVEX 2-73 in at least 69 pediatric patients, aged 5 to 18, over a 12-week treatment period.

A competitor pharmaceutical company, Neuren, had previously worked on a Rett Syndrome drug, which was called DAYBUE, beginning in 2012.

A metric for measuring a drug's effectiveness in these studies is known as an "endpoint." There appear to be multiple endpoints that were in use in studies involving drugs developed to treat Rett Syndrome. The first is RSBQ (Rett Syndrome Behavior Questionnaire); the second is CGI-I (Clinical Global Impression-Improvement); and the third is a combination of the two, known as RSBQ AUC (Rett Syndrome Behavior Questionnaire Area Under the Curve) – which is described by Defendants as tying the two prior metrics together in a way that will mitigate the variability in individual patient assessments by filtering out patients who, while seeming to improve using the RSBQ endpoint, do not register clinically meaningful improvement on the CGI-I endpoint.

Anavex used RSBQ AUC in its first study, the AVATAR study. It originally planned to use the same endpoint in the second, EXCELLENCE, study, and through Missling, Anavex made multiple statements to that effect: on February 1, 2022 (Am. Compl. ¶¶ 75; 78); February 9, 2022 (*id*. ¶¶ 81; 83)); May 10, 2022 (*id*. ¶ 86); November 28, 2022 (*id*. ¶ 89); and January 12, 2023 (*id*. ¶ 92). While Plaintiff suggests various ways why these statements were misleading, her allegations all boil down to the same thing: the statements were allegedly misleading because Anavex knew that it could not use the RSBQ AUC endpoint in the EXCELLENCE study, even though it had

7

used that metric in the AVATAR study. Anavex allegedly knew that the FDA did not permit the use of that particular metric, although Plaintiff points to no FDA rule, public statement, or other promulgation to that effect. Instead, she alleges that the FDA had said as much to Neuren – Avatar's competitor – at a 2017 meeting concerning the testing of Neruen's competing drug. Plaintiff does not allege that anyone from Anavex was at that meeting or that the matters discussed at the meeting were made public – let alone that anything the FDA said to Neuren applied to any other drug manufacturer or any other clinical trial. Nor is applicability to other manufacturers' trials a logical inference that can be drawn from the facts that are pleaded about the FDA's conversation with Neuren.

In every one of the pre-February 2023 statements that is alleged to be false, Missling said that Anavex intended to use RSBQ AUC – or the same metric that was used in the original AVATAR study – to evaluate the success of EXCELLENCE. Not a single fact is alleged tending to show that Anavex did not so intend.[1] The statements made by Missling are literally true. And because Plaintiff fails to plead any fact that might indicate that, prior to early 2023, the FDA found reliance on that metric to be unacceptable, there was nothing left out of Missling's statements that was misleading. For these reasons, Plaintiff fails to plausibly plead that any of the pre-February 2023 statements is false.

Then something changed.

At some point prior to February 2, 2023 (although the exact date is not pleaded), Anavex was in communication with the FDA about the EXCELLENCE study. Shortly thereafter, on

---

[1] Any perceived inconsistency stemming from the out-of-date EXCELLENCE trial protocol from 2020 that remained on clinicaltrials.gov was clarified to the market at the start of Plaintiff's class period by Missling's statements that clinicaltrials.gov was not "completely up to date" and that "ClinicalTrials.gov is not what we want to refer as to company communication." (Am. Compl. ¶ 81).

8

February 2, 2023, Anavex issued a press release, which said, "in communication with the FDA, we received their input on the endpoints, which were utilized in [the EXCELLENCE] study." (*Id.* ¶ 94). The Anavex press release did not say what the FDA's input was or whether it had caused Anavex to make a change to its previously disclosed use of RSBQ AUC as the endpoint for the EXCELLENCE study. Plaintiff claims that the press release was misleading because it omitted to disclose that the FDA told Anavex that use of RSBQ AUC was unacceptable.

Plaintiff's evidence for this allegation was a statement made five days later (February 7, 2023) by Missling during an analyst call. An analyst asked Missling to "confirm that the primary end point is RSBQ AUC similar to -- or the same to the one used in the AVATAR study," and further asked whether the FDA had "agreed that AUC, the modified RSBQ scale, can be an appropriate end point for Rett syndrome study?" (*Id.* ¶ 94). Missling responded, "Yes. We have it described in clinicaltrial.gov, and it was also never changed in clinicaltrial.gov for the EXCELLENCE study. It is the RSBQ as primary end point, and the CGI-I is key secondary end point over the course of the trial." (*Id.*). Missling further stated that this was "slightly different" from the endpoint that was used in the AVATAR study – "Not AUC" – because "the study is large enough that it can carry the signal by itself without AUC." (*Id.*). This is the first time that Anavex acknowledged that it would deviate from its previously announced endpoint for the EXCELLENCE trial, which was RSBQ AUC. Although this turns out to be the curative statement, Plaintiff alleges that this February 7 statement was itself misleading, in that Missling equivocated about whether he was changing his prior guidance or not.

I agree with Plaintiff that she has pleaded falsity with respect to the omission of the FDA's endpoint guidance from the February 2 press release. Although "courts have held that there is no duty to disclose the results of FDA inspections that do not reflect final agency determinations,"

9

*Sanofi*, 87 F. Supp. 3d at 542 (collecting cases), "a duty to disclose arises whenever [nonpublic] information renders prior public statements materially misleading." *Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 F. App'x 260 (2d Cir. 2010) (internal citations omitted). "[O]nce a company speaks on an issue, it has a duty to be accurate and complete." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017). Anavex had unquestionably spoken, repeatedly, about the endpoint it was using in connection with the EXCELLENCE trial, so if, as Plaintiff alleges, it learned that the FDA would not accept the use of that endpoint, it had a duty to disclose that fact. On February 2, it disclosed only that the FDA had said something; it did not disclose what the FDA said. It was not until five days later that Missling admitted that Anavex would not be using RSBQ AUC, or the same metric that it had used in the AVATAR study, to measure the results of the EXCELLENCE trial. It is a fair inference that the communication received from the FDA – which Missling disclosed was related to "their input on the endpoints which were utilized in [the EXCELLENCE] study" – was the reason for the sudden switch.

Plaintiff's allegation that the February 2 statement was misleading by omission is plausible for the same reason that a similar omission was found to be materially misleading by my colleague Judge Subramanian in *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691 (S.D.N.Y. Feb. 5, 2024). In that case, Judge Subramanian held that the plaintiff "plausibly alleged conflicts between . . . [Defendants' public statements] and the FDA's immediately preceding feedback that would make these statements materially misleading." *Id*. at *10. As Judge Subramanian reasoned, "Defendants made several public statements concerning the back-and-forth with the FDA, which indicates that Defendants themselves understood that the FDA's feedback was material. Having done this, Defendants were not permitted to disclose this interim feedback in a partial and misleading manner." *Id*. at *11.

10

I thus conclude that Plaintiff has plausibly alleged that the February 2, 2023 press release was materially false and misleading.

I do not reach the same conclusion with respect to the February 7 statements made during the analyst call. Plaintiff is quite correct that Missling tried to minimize, in his responses to the analyst's questioning, whether Anavex was changing the EXCELLENCE endpoint; he even claimed that the new approach was consistent with the EXCELLENCE protocol posted on clinicaltrials.gov back in 2020, which he had previously said was not "completely up to date" and "not what we want to refer as to company communication." (Am. Compl. ¶ 81). However, in the end, Missling did admit that Anavex would not be using RSBQ AUC to evaluate EXCELLENCE, and that this was "slightly different" from what it had done during AVATAR. Even construing the facts in Plaintiff's favor, there is no escaping the fact that Missling finally said, in words of one syllable, that Anavex was changing the endpoint for the EXCELLENCE trial from RSBQ AUC to something else. Therefore, the statement, read as a whole (as one must), cannot be deemed false or misleading.

Plaintiff identifies one more allegedly false statement in her complaint. During an August 8, 2023 Anavex conference call, Plaintiff claims that Missling touted Anavex's recent trial results despite allegedly knowing "that Anavex's collective trial data from the U.S.-based Phase 2 trial, the AVATAR trial, and the EXCELLENCE trial was insufficient to support a regulatory approval package," meaning that Missling's positive statement, "falsely cast the clinical trial results for ANAVEX 2-73 in a materially positive light," and led to positive analyst reports. (*Id*. ¶¶ 102-03). In this statement, Missling said Anavex was "encouraged for the results of this upcoming data readout" and provided specifics on the data. (*Id*. ¶ 101). However, the Second Circuit has routinely found "'puffery'—like Defendants' descriptions of . . . results as 'encouraging' . . . —actionable

11

only when the speaker knew that the contrary was true." *Abramson*, 965 F.3d at 173-174 (internal citations omitted). Plaintiff counters that "Missling knew that Anavex's collective trial data from the U.S.-based Phase 2 trial, the AVATAR trial, and the EXCELLENCE trial was insufficient to support a regulatory approval package," (*id*. ¶ 102), but this is not supported by the facts alleged. As discussed above, the fact that "the FDA had already granted approval to [the competing] DAYBUE," drug application, (*id*.), does nothing to support a particularized allegation that some specific endpoint requirement applied to Anavex's studies.

Plaintiff has moved for leave to replead her entire Amended Complaint in the event of its dismissal, but the pleading deficiencies identified by the Court with respect to the statements discussed above cannot be cured by amendment. The statements discussed in the preceding pages are either: (1) literally true at the time they were made; (2) entirely conclusory; (3) forward-looking with appropriate qualification, which means they fall within the safe harbor provision of the PSLRA; (4) puffery; or (5) fraud by hindsight pleading, which cannot support a securities fraud claim. It is not necessary to address either scienter or loss causation in order to dismiss allegations of securities fraud based on these statements; and in light of the reasons why those claims have been dismissed, amendment would be futile. It is, therefore, not allowed.

The end result is that, of the ten statements identified by Plaintiff, exactly ONE of them is plausibly alleged to be false. This radically simplifies the analysis of whether the Complaint adequately pleads scienter and loss causation.

b. **Scienter**

The complaint sufficiently alleges that the February 2, 2023 statement was made by Anavex/Missling with scienter – which is to say, with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319, 323 (internal citations omitted).

A plaintiff can plead scienter in one of two ways: by pleading facts tending to show a motive and opportunity to commit fraud; or by pleading facts that give rise to strong circumstantial evidence of conscious misbehavior or recklessness. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *19 (S.D.N.Y. Nov. 18, 2019) (citing *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99 (2d Cir. 2009))*.* In this case, Plaintiff succeeds in pleading strong circumstantial evidence of conscious misbehavior or recklessness. That is because Plaintiff pleads facts from which a trier could find that Defendants had access to information suggesting that their public statements were not accurate. Such allegations are enough in and of themselves to satisfy scienter at the pleading stage.

To adequately plead scienter based on access to information that contradicts public statements, "a plaintiff must either 'specifically identify the reports or statements that are contradictory to the statements made' or 'provide specific instances in which Defendants received information that was contrary to their public declarations.'" *Schiro*, 396 F. Supp. 3d at 308 (quoting *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011)). Here, Plaintiff provides a specific instance, Anavex's admitted communication with the FDA regarding endpoints, where Defendants allegedly learned information that contradicted countless statements Anavex had previously made about endpoints. Even Defendants' Motion to Dismiss Brief supports this timeline. It proposes a timeline in which "Anavex . . . intended to use [RSBQ AUC] for Excellence, as it communicated publicly, but partway through the Class Period Anavex met further with the FDA and, based in part on those discussions, decided to instead use RSBQ and CGI-I as co-primary endpoints." Dkt. No. 37, at 21. These allegations present strong circumstantial evidence of Defendants' conscious

misbehavior or recklessness in presenting incomplete and intentionally misleading information in the February 2, 2023 press release.

But this does not get Plaintiff across the finish line. She stumbles because she fails to plead loss causation.

c. **Loss Causation**

Ironically, loss causation is generally the easiest thing to plead, although it is often hard to prove. Plaintiff's burden in pleading loss causation is "not a heavy one," and "must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). But here, Plaintiff fails to surmount even that low hurdle. That is because on February 7, 2023 – the day when the curative information was first revealed during an 8:30 a.m. pre-market earnings call – Anavex's stock price closed up, at $11.75 per share. (Am. Compl. ¶ 115; Exhibit 25 to Declaration of Stephen G. Topetzes). This was 5.76% *higher* than the previous day's closing price of $11.11, and 3.34% higher than the stock's closing price of $11.37 on February 2 – the day when the misleading statement was originally made.

Second Circuit precedent establishes "certain parameters" for successfully alleging loss causation, *Lentell*, 396 F.3d at 174, including that plaintiffs "allege that their share's 'price *fell significantly* after the truth became known,'" *Abramson*, 965 F.3d at 179 (quoting *Vivendi*, 838 F.3d at 262) (emphasis added). In a 2010 case that was subsequently affirmed by the Second Circuit, Judge Sullivan compellingly explained that, "The Court cannot find, and Plaintiffs have not cited, a single section 10b–5 case in which the plaintiff prevailed on a motion to dismiss when the stock price increased after an announcement revealing an alleged fraud." *Waters v. Gen. Elec.*

14

*Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010), *aff'd sub nom. GE Invs. v. Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011).

To the contrary, although loss causation determinations are often fact-specific, the majority of cases in this Circuit addressing the issue have held that plaintiffs "cannot show loss causation" at the pleading stage when a company's stock price "went up," not down, on the date of an alleged corrective disclosure. *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, at *10 (D. Conn. Mar. 31, 2018); *see also In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 380 (S.D.N.Y. 2018) ("Given that [defendant's] stock price increased on March 29, rather than decreased, it is far from clear that plaintiffs have met their burden as to loss causation -- even though that burden is a low one at the pleading stage."); *In re China Life Sec. Litig.*, 2008 WL 4066919, at *7 (S.D.N.Y. Sept. 3, 2008) (no loss causation where defendant's "stock rose" on day of alleged corrective disclosure).

The Second Circuit has also addressed this issue directly, albeit in *dictum*, in the case *Ross v. Lloyds Banking Grp.*, 546 F. App'x 5 (2d Cir. 2013). There, the Court found that, although a district court order dismissing a shareholder's claims under Section 10(b) should be affirmed in light of the plaintiff's failure to plead scienter, the plaintiff also failed to "adequately plead that [defendant's] nondisclosure of [a fact] caused a loss *in view of the fact that the price of [defendant's ADRs] increased the day after disclosure of that [fact]*." *Id*. at 12 n.2 (emphasis added).

Plaintiff argues that the 5.76% increase to Anavex's stock price on the day of the pre-market curative statement does not prevent her ability to plead loss causation, because Anavex's stock price declined  over the next two days. It is true that the stock subsequently declined. The stock price went down 6.98% on February 8, closing at $10.93 (though it traded as high as $11.90

15

during that day). It went down another 4.76%, to $10.41, on February 9. Notably, these stock price movements mirrored the direction of leading market indices on February 7, 8, and 9.[2]

Plaintiff cites an Eastern District of New York case, *Swanson v. Interface, Inc.*, 2022 WL 2003990 (E.D.N.Y. June 6, 2022), to support her argument that one should look to the price decline over a three-day period, not simply at what occurred on the date of the corrective disclosure. In *Swanson*, a securities fraud complaint survived a motion to dismiss despite the defendants' argument that the stock price actually increased after the alleged fraud was revealed. There, the company's stock price increased on the day of the pre-market corrective disclosure – by 1.92% – before falling – by 3.3% – the next day. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint at 21, *Swanson v. Interface, Inc. et al.*, 20-cv-05518-BMC (E.D.N.Y. June 16, 2021), ECF No. 42. Denying the defendants' motion to dismiss, Judge Cogan held that it was "not fatal to plaintiff's case at this stage that [the defendant's] stock price fell 3.3% one day after [the corrective disclosure]." *Id*. at *3.

There are several reasons to distinguish *Swanson*, but the principal one is that, in our case, the market moved sharply higher, almost six percent over the course of an entire trading day, following the pre-market (8:30 a.m.) "corrective" disclosure. In *Swanson*, by contrast, the market increased by only 1.92% over the same period of time.[3] Moreover, Judge Cogan's opinion appears to be an outlier. Like Judge Sullivan in *Waters*, I have found no other case in a Second Circuit court – certainly not in the Court of Appeals – in which loss causation was challenged based on

---

[2] February 7:  DJI up .78%; NASDAQ up 1.90%; S&P up 1.29%. February 8:  DJI down .61%; NASDAQ down 1.68%; S&P down 1.11%. February 9:  DJI down .73%; NASDAQ down 1.02%; S&P down .88%.

[3] Although not discussed by Judge Cogan in his opinion, the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint claims that the "corrective" SEC Settlement at issue in that case was also announced before the start of trading. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint at 21, *Swanson v. Interface, Inc. et al.*, 20-cv-05518-BMC (E.D.N.Y. June 16, 2021), ECF No. 42.

16

evidence that the stock price increased on the day of the corrective announcement, but ultimately deemed adequately pleaded. Because an order denying a motion to dismiss is not appealable, one cannot know whether the Circuit would have agreed with Judge Cogan.

Plaintiff's other two cited cases are even further from the mark. Plaintiff draws from the case *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69 (S.D.N.Y. 2015) the proposition that "a two- to three-day window is common in event studies," arguing that the Court can disregard a supposedly aberrant stock price increase on the day of the alleged corrective disclosure if the stock declines on the following days. *Id*. at 96. But the court in *Carpenters Pension* was addressing market efficiency, not loss causation, and specifically explained that "defendants' contentions about what can or cannot cause a price drop *are arguments about loss causation*, which . . . is not an element of market efficiency. Plaintiffs are not required to prove loss causation on class certification and this evidence is not being offered for that purpose." *Id* at 95-96 (emphasis added). Plaintiff also cites the procedurally distinct case, *Sjunde AP-Fonden v. Gen. Elec. Co.*, 2023 WL 6314939 (S.D.N.Y. Sept. 28, 2023), which held, in deciding a *Daubert* motion, that an expert witness's "use of a three-day window in part of his event study is not grounds for exclusion." *Id*. at *16. These cases do little to suggest that loss causation is properly alleged where, as is the case here, the defendant corporation's stock materially went up, not down, over the trading day following a pre-market corrective disclosure and ultimately closed higher than the stock had been on the date of the original misstatement.

For the foregoing reasons, the Court holds that Plaintiff has failed to plead loss causation for the Defendants' alleged failure to disclose, between February 2, 2023 and February 6, 2023, that the EXCELLENCE trial would use different endpoints than those used in the AVATAR trial.

Finally, Plaintiff's motion for leave to amend her complaint yet again is denied because amendment would be futile. While plaintiff does not provide the court with a proposed second amended complaint (normally a prerequisite to a motion for leave to amend), it is clear that she cannot plead falsity with respect to any statement other than the February 2, 2023 press release, and she cannot plead loss causation resulting from that statement because the stock price went up, not down, on the date of the corrective disclosure.

### III.  All Claims Asserted Under Section 20(a) of the Securities Exchange Act of 1934 Are Dismissed With Prejudice and Without Leave to Amend

Section 20(a) of the Exchange Act establishes joint and several liability for every person who, directly or indirectly, controls any person liable for a primary violation under the respective acts. *See* 15 U.S.C. §§ 77o(a); 78t(a). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Because Plaintiff fails to allege any primary securities law violation by any defendant in this case, Plaintiff's claim under Section 20(a) of the Exchange Act is dismissed. *See Lau*, 527 F. Supp. 3d at 562.

### CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Amended Complaint is GRANTED. The Clerk of the court is directed to remove Docket No. 36 from the Court's list of pending motions and to close the file. As previously explained, I find that it would be futile for

18

Plaintiff to file a second amended complaint to cure the pleading defects of the first, and the "motion" inserted in Footnote 4 at the end of the Opposition Brief is denied.

This constitutes the decision and order of the court. It is a written decision.

Dated: June 18, 2025

*[signature]*

U.S.D.J.

BY ECF TO ALL COUNSEL